NOT DESIGNATED FOR PUBLICATION

No. 128,398

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of B.F.,
a Minor Child.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; JOAN M. LOWDON, judge. Submitted without oral argument. Opinion filed July 25, 2025. Affirmed.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, for appellant natural mother.

*Sarah Ikena*, assistant county attorney, for appellee.

Before CLINE, P.J., MALONE and PICKERING, JJ.

PER CURIAM: The district court terminated Mother's parental rights to B.F. (born in 2018), citing four statutory factors for determining unfitness. Mother appeals, arguing that there was not clear and convincing evidence that she was unfit or that her conduct was unlikely to change in the foreseeable future. Mother also contends that termination was not in B.F.'s best interests. Finally, Mother claims that Cornerstones of Care (COC) violated her due process rights by preventing reintegration based on an alleged, but apparently nonexistent, Department for Children and Families (DCF) policy against reintegration when there is a sex offender in the home. After reviewing the record, we find Mother's arguments unpersuasive and affirm the district court's termination of Mother's parental rights.

1

On January 6, 2022, DCF received a report alleging sexual and physical abuse, neglect, and lack of supervision of B.F. by Mother and her boyfriend, S.B. According to the report, B.F., who was three years old at the time, was not potty trained, went to the bathroom "all over the home" causing an unsanitary environment, and was underweight due to lack of nutrition. The report stated Mother "smacks [B.F.] across the face and has left red marks," and she and S.B. "scream and use profane language" toward B.F. and would yank his arm. Mother and S.B. also allegedly partook in "frequent sexual behavior" in front of B.F., including "exposing their body parts" and having B.F. in the shower with them while they had intercourse.

The day DCF received the report, DCF child protection specialist Jayme Robinson visited Mother's home. Mother told Robinson she was engaged to Father, who was in prison at the time for what Mother described as "'just' looking at pictures on the computer." DCF later learned Father was incarcerated for two counts of sexual exploitation of a child. Mother was dating S.B. while she waited for Father's release from prison.

S.B. told Robinson he had lived with Mother since April 2021. He reported having no criminal or DCF history, though DCF had "a history of concerns for him." DCF learned S.B. had been charged in April 2021 with promoting obscenities for masturbating while supervising B.F. at a park. He was on probation for that offense until August 2022. Mother moved S.B. into her home after that incident occurred. DCF had also identified S.B. as a "sexual perpetrator in another DCF case." DCF was concerned that Mother could not protect B.F., citing Mother's "history of being with men who are sexual perpetrators and her inability to understand that this is unsafe for [B.F.]"

2

During the home visit, Robinson observed that B.F. was small for his age, though Mother claimed B.F.'s primary care physician was not concerned with his size. Robinson had trouble understanding B.F. due to his cognitive functioning and delayed language development, causing concern that if anything happened to B.F., he would not be able to articulate his concerns. Mother also reported she was worried that B.F. did not know his alphabet or how to count.

On February 24, 2022, the State filed an application for ex parte order of protective custody. The State alleged that during a meeting on January 14, 2022, Mother tried to "normalize" Father's and S.B.'s sex offenses and stated she would allow S.B. back into her home because she needed help with B.F. The district court granted the application that same day and placed B.F. in DCF protective custody.

On the same day as the application and order for protective custody, the State also filed a petition to adjudicate B.F. as a child in need of care (CINC). At a May 12, 2022 hearing, the district court found B.F. was a child in need of care as to Mother, who signed a statement of no contest to the CINC petition. The court continued the CINC adjudication as to Father to June 8, 2022. In the meantime, on May 21, 2022, Mother married a different man, T.S., who was also a registered sex offender after his conviction for rape of an adult.

On May 26, 2022, Mother signed a proposed reintegration plan that, among other things, prohibited Mother from associating with any individual with a known history of sexual abuse in any capacity. The proposed plan also barred Mother from allowing anyone to spend the night in her home unless COC gave prior approval or the person was an approved household member.

At the June 8, 2022 adjudication hearing, the district court found B.F. was a child in need of care as to Father. During the hearing, the State claimed that under the proposed

3

reintegration plan, T.S. should not have contact with B.F. because T.S. was a registered sex offender. Mother challenged the proposed reintegration plan, arguing that it interfered with her marriage to T.S. and T.S. should be allowed in the home during visits with B.F. The district court overruled Mother's objection and adopted the proposed reintegration plan, which contained 21 tasks, including:

- Maintain regular and consistent visitation;
- refrain from associating with individuals with a known history of sexual abuse in any capacity;
- complete a parenting education program approved by COC;
- complete a mental health assessment;
- refrain from using or possessing alcohol or illegal drugs; and
- maintain suitable housing and a legal source of income.

On June 21, 2022, the district court ordered supervised visitation for Mother. During a review hearing on October 11, 2022, Mother informed the district court that she was pregnant with T.S.'s child. On February 23, 2023, the district court held a permanency hearing, where it found that reintegration was still viable as Mother made adequate progress on her reintegration tasks.

On April 17, 2023, the State filed a motion to terminate both Mother's and Father's parental rights, citing four statutory factors as to Mother:

- K.S.A. 38-2269(b)(1) (emotional or mental illness, mental deficiency, or physical disability rendering the parent unable to care for the child);
- K.S.A. 38-2269(b)(7) (failure of reasonable agency efforts to rehabilitate the family);

- K.S.A. 38-2269(b)(8) (lack of effort to adjust circumstances, conduct, or conditions to meet the child's needs);

- K.S.A. 38-2269(c)(3) (failure to carry out a reasonable court-approved plan directed toward reintegration).

On July 12, 2023, the district court held a termination hearing. At the beginning of the hearing, Father relinquished his parental rights to B.F. The State presented four witnesses: Dr. Steve Hazel, a psychologist at Responsive Centers for Psychology and Learning; Robinson; Reve Montour, Robinson's supervisor; and Abigail Wieberg, the COC case manager.

During the termination hearing, the district court took judicial notice of the CINC adjudication hearing and ruling for T.J.S. (born in 2023), Mother's child with T.S. The district court had adjudicated T.J.S. as a child in need of care on May 31, 2023.

On September 12, 2023, the district court terminated Mother's parental rights, finding her unfit under all four statutory factors alleged by the State. Mother now appeals.

ANALYSIS

I.      *The District Court's Finding that Mother Was Unfit Was Supported by Clear and Convincing Evidence*

*Standard of Review*

"Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses,

5

or redetermine questions of fact." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

*Discussion*

A.    *Findings of Unfitness*

K.S.A. 38-2269(b) contains a nonexhaustive list of factors district courts must consider in determining whether a parent is unfit. Among those factors are:

> "(1) Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child;
> . . . .
> "(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;
> "(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 38-2269(b)(1), (b)(7)-(8).

K.S.A. 38-2269(c) provides additional nonexhaustive factors the district court must consider when a child is not in the parent's physical custody. One of those factors is "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." K.S.A. 38-2269(c)(3). Any factor "standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 38-2269(f).

6

1. *K.S.A. 38-2269(b)(1)—Emotional or mental illness, mental deficiency, or physical disability*

Mother claims Dr. Hazel, whose testimony the district court cited for this factor, testified that people with lower cognitive functioning could parent with additional state services and never concluded that Mother was unable to parent. Therefore, Mother argues the district court "made an inappropriate leap" in finding Mother unfit based on her intellectual disability.

The State responds that, while Dr. Hazel believed people with lower cognitive functioning could parent, he also testified that Mother may be unable to protect B.F. The State submits that Mother never addressed the "serious issues and concerns" that caused B.F.'s removal from the home.

Before the termination hearing, in January 2023, Dr. Hazel prepared a report on the parenting assessment and psychological testing he conducted on Mother in December 2022. Dr. Hazel concluded Mother's general cognitive ability was "Extremely Low." Mother's verbal comprehension, perceptual reasoning, and "ability to sustain attention, concentrate, and exert mental control" were also "Extremely Low." Dr. Hazel diagnosed Mother with a moderate intellectual disability, depression, and anxiety. He also found Mother had "Relational Distress With Spouse or Intimate Partner," explaining that Mother was "dependent on others, particularly men," and "may exhibit a pervasive need to be taken care of that leads to submissive and clinging behavior."

Dr. Hazel was concerned with Mother's ability to meet B.F.'s physical and emotional needs and her ability to put B.F.'s safety above her own needs. He found Mother's cognitive functioning affected her ability to parent B.F. on a daily basis. He also highlighted Mother's "ability to maintain a safe, appropriate, and stable home

7

environment" and her "ability to make good choices regarding her relationships and the people to whom she exposes" B.F. as particular parenting concerns.

At the termination hearing, Dr. Hazel further explained these findings. He testified that Mother "did a very nice job" interacting with B.F. during the parenting observation. However, Dr. Hazel also reiterated his concerns with Mother's parenting, namely her ability to protect B.F. He explained that with Mother's lower cognitive functioning, she had difficulty judging who to associate with and how to care for B.F. Dr. Hazel observed that Mother had "some recognition" of her history of dating sex offenders, but those relationships remained a concern. He recalled that during an interview, Mother told him B.F. "'would never be exposed to unsafe people'" even though such exposure had occurred. In Dr. Hazel's view, this showed Mother did not understand the risks her relationships posed to B.F.

On cross-examination, Dr. Hazel acknowledged that people with Mother's cognitive functioning "often" parent children, though "most of the time" they need additional services. When asked if someone who had committed a sex crime against an adult is "automatically" dangerous around a child, Dr. Hazel responded that he was unsure of the data on that topic but his "gut feeling" was that it remained a concern.

The district court cited Dr. Hazel's testimony and Mother's "minimal" progression in visitation to find Mother unfit under K.S.A. 38-2269(b)(1).

In analyzing this factor, the district court looked to *In re L.J.*, No. 123,969, 2021 WL 5409698 (Kan. App. 2021) (unpublished opinion). There, the mother's psychological assessments showed her "'general cognitive ability [was] within the Borderline range of intellectual functioning,'" and her "'overall cognitive functioning [was] within the Extremely Low Average range.'" 2021 WL 5409698, at *2. The psychologist who assessed the mother believed her cognition issues "'do not necessarily inhibit her ability

8

to adapt to domestic life, given the opportunity to learn.'" 2021 WL 5409698, at *2. The psychologist also diagnosed the mother with mild intellectual disability, avoidant/schizoid personality type disorder, depression, and anxiety. 2021 WL 5409698, at *2. The district court found the mother unfit under several statutory factors, including K.S.A. 38-2269(b)(1), citing her "'significant cognitive disabilities'" and evidence that she could not "'adequately supervise'" or discipline her children during visitation. 2021 WL 5409698, at *8.

On appeal, the mother claimed the psychologist never testified that her diagnoses made her unable to care for her children's needs. The *In re L.J.* panel found that argument mischaracterized the district court's ruling, which focused on the mother's conduct throughout the case rather than relying solely on her diagnoses. Multiple caseworkers believed the mother could not adequately supervise or care for her children. The mother also testified that she did not understand all of her children's developmental needs. The panel concluded the mother's diagnoses "influenced and explained some of her actions," but the district court relied on the mother's conduct, which showed that she was unfit. 2021 WL 5409698, at *9.

Mother argues this case is distinguishable from *In re L.J.* She asserts the mental health and cognitive issues in *In re L.J.* "were much more serious" and resulted in chaotic visits and dangerous conditions. In contrast, Mother suggests she "interacted and dealt with B.F. appropriately during her visits." In her view, the only parallel between this case and *In re L.J.* is a parent with lower cognitive functioning.

The State counters that the "key point" of *In re L.J.*, similar to this case, is that the parent failed to progress toward reintegration.

Mother is correct that her visits were not as chaotic or dangerous as those in *In re L.J.* That said, the children in *In re L.J.* entered DCF custody because they lived in a

dirty, insect-infested home. The chaotic visits factored into the finding of unfitness, but the *In re L.J.* panel noted more broadly that there was "no change in . . . the same parenting skills that resulted in the children being removed from [the mother's] home." 2021 WL 5409698, at *9.

Here, Montour and Robinson testified that the decision to request B.F.'s removal from the home resulted from Mother's willingness to allow sex offenders near B.F. and her admitted struggles with parenting alone. Dr. Hazel and Wieberg testified that Mother did not make progress in understanding child endangerment and concerns with exposing children to sex offenders in the home. All four witnesses testified that Mother depended on others and struggled with parenting B.F. by herself. Therefore, like *In re L.J.*, the evidence shows Mother's intellectual disability affected her ability to parent and she failed to improve on the parenting skills that caused B.F. to be removed from the home.

Moreover, *In re L.J.* is not the only time this court has confronted a parent's mental functioning in parental termination proceedings. In *In re D.M.*, No. 125,894, 2023 WL 4145324 (Kan. App. 2023) (unpublished opinion), the mother was diagnosed with a moderate intellectual disability, dependent personality disorder, and depression. Her mental deficiency hindered her judgment and ability to meet D.M.'s needs. The *In re D.M.* panel found this evidence, standing alone, clear and convincing under K.S.A. 38-2269(b)(1). 2023 WL 4145324, at *7. But in affirming the district court's finding on this factor, the panel also pointed to the mother's history of abusive relationships, her lack of understanding why her abusers should not be around D.M., and her struggles with parenting by herself. 2023 WL 4145324, at *8; see *In re C.B.*, No. 112,337, 2015 WL 2137313, at *7 (Kan. App. 2015) (unpublished opinion) (affirming finding of unfitness where the mother's intellectual functioning affected ability to parent without guidance; testimony showed failure to adequately supervise and care for children).

10

Here, Dr. Hazel found that Mother's moderate intellectual disability affected her judgment of the men she allowed to be around B.F. and her ability to meet B.F.'s physical and emotional needs. Though Dr. Hazel testified that people with Mother's cognitive functioning could parent with additional support services, there was ample evidence in this case that Mother failed to understand the dangers of allowing sex offenders near B.F. The evidence also showed Mother struggled to parent on her own and was unable to put B.F.'s needs above her own. In sum, there was clear and convincing evidence that Mother's emotional or mental illness or mental deficiency was of such nature or duration that she was unable to care for B.F.'s ongoing needs under K.S.A. 38-2269(b)(1).

2. *K.S.A. 38-2269(b)(7)—Failure of reasonable agency efforts to rehabilitate the family*

Mother contends that because she had "only minimal items" to complete among her reintegration tasks, the district court should have allowed the reintegration process to continue. She claims she completed most tasks but could not complete her Darkness to Light class, which instructed on the effects of sexual abuse on children, due to COC eliminating its parent-partner position. Mother also asserts COC did not make reasonable efforts, suggesting Wieberg improperly relied on DCF policy in barring unsupervised visits and reintegration based on T.S.'s status as a sex offender when such policy did not exist.

The State replies that COC made reasonable efforts by providing a parent partner to help Mother complete her Darkness to Light class, although the agency later eliminated that position. The State notes that the continued presence of sex offenders in the home was the primary factor in Mother's failure to reintegrate.

At the CINC adjudication hearing on June 8, 2022, the district court adopted a reintegration plan which, among other tasks, required Mother to complete a parental

education program approved by COC and to refrain from associating with known sex offenders.

Mother signed the proposed reintegration plan on May 26, 2022, five days after she married T.S. Wieberg knew at the time that Mother was in a relationship with T.S. but did not know they had married. Wieberg testified that the marriage would not have changed her recommendation that Mother not associate with sex offenders. Before Mother married T.S. and signed the proposed reintegration plan, Wieberg had told Mother three times that her relationship with T.S. "would make reintegration difficult and near impossible due to the fact that [T.S.] is on the sex offender registry."

At the time of the termination hearing, Mother had completed several reintegration tasks. She had completed a parenting class and mental health assessment and was receiving mental health services. Wieberg testified that Mother had stable housing, as she and T.S. were living at Mother's grandparents' home. Mother was not working and relied on her grandparents for housing and income. Mother attended 50 of 70 possible visits, and Wieberg testified that Mother's engagement with B.F. during those visits had "increased tremendously" during the case. Wieberg admitted her own fault in failing to grant extended visits to make up for cancelled visits.

Mother had started the Darkness to Light class with a parent partner to assist her in understanding the class. However, COC ultimately eliminated its parent-partner position due to a lack of resources, and Mother did not complete the class. The court reports show COC eliminated the parent-partner position some time before January 4, 2023. The agency did not have other parent aides available in the county to fill in for Mother's parent partner. Wieberg knew part of the class was online but was unsuccessful in obtaining the login information for Mother. Wieberg also tried finding time to accompany Mother herself but was unable to do so because of her case load.

To proceed with reintegration, Wieberg believed Mother needed to complete the Darkness to Light class and advance to unsupervised visits. She testified that it would not be "necessarily difficult" to find a class suited to Mother's needs, and COC could assist with any costs. Wieberg stated there were also other places Mother could contact for assistance with the class, and the parent partner had provided those suggestions to Mother before the parent partner's departure.

Wieberg believed reintegration would be an option if T.S. moved out of Mother's home. Mother had not progressed to unsupervised visitation due to concern that T.S. might attend any unsupervised visits. Wieberg did not believe DCF would allow reintegration with a sex offender in the home, given that B.F. was removed due to exposure to sexual activity and Mother's failure to recognize the danger of having sex offenders near B.F.

At the outset, we must address Mother's characterization of Wieberg simply relying on DCF policy regarding T.S.'s sex offender status. True, Wieberg testified at the termination hearing that she assumed DCF had a policy against allowing reintegration when there was a sex offender present in the home but could not identify the specific policy. But the bar to reintegration from T.S.'s sex offender status did not simply arise from an alleged DCF policy. The district court approved a reintegration plan that prohibited Mother from knowingly associating with individuals with "a known history of sexual abuse in any capacity." Thus, the parties were operating under a court-ordered reintegration task, not the whims of Wieberg or the DCF policy and procedure manual. And Mother does not challenge the reasonableness of the reintegration plan on appeal.

Additionally, the reintegration plan aside, Wieberg testified that DCF has communicated to COC that it may not place a child in a home if a person with a criminal background is present. She stated there were "numerous times" that COC was unable to

13

place a child in a home under such circumstances. Wieberg was not simply acting on her own authority to create a policy out of thin air, as Mother suggests throughout her brief.

Turning to Mother's other claims, we are mindful that the record shows Mother did complete many of her reintegration tasks. But another panel of this court recently considered a similar argument that only "minimal" tasks remained incomplete in *In re H.T.*, No. 127,344, 2024 WL 4248418, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 319 Kan. 833 (2024). There, the record showed the father completed 21 of his 25 case plan tasks, the outstanding tasks being outpatient drug treatment, an online domestic violence class, a home walkthrough, and individual therapy. Like Mother's argument here, the father claimed the district court should have allowed more time to complete his case plan tasks since "only minimal items remained." 2024 WL 4248418, at *6. The *In re H.T.* panel found that argument unpersuasive, noting the incomplete tasks were "important" and the father had over a year to complete them. 2024 WL 4248418, at *6. Therefore, the panel found the evidence was clear and convincing that the father was unfit under K.S.A. 38-2269(b)(7). 2024 WL 4248418, at *7.

Here, Mother completed most reintegration tasks. But she did not complete the Darkness to Light class and, at the time of the termination hearing, remained in violation of her reintegration task prohibiting her from associating with known sex offenders. We understand that Mother appears to have been progressing through the Darkness to Light class until COC eliminated its parent-partner position. That said, Wieberg testified that finding classes suited for Mother's needs would not be exceedingly difficult and the agency could assist with any costs. Wieberg also stated the parent partner provided Mother with resources for assistance with classes before her departure. Mother had at least six months between the parent partner's departure and the termination hearing to explore those resources. See *In re O.B.*, No. 90,034, 2004 WL 90072, at *2 (Kan. App. 2004) (unpublished opinion) (finding reasonable agency efforts failed where agency

ended sexual offender therapy for financial reasons and advised Father of other agencies with similar services).

Moreover, Mother had known of the prohibition on associating with sex offenders for over a year, and case workers had multiple discussions with her on the issues that her relationship with a sex offender would pose to reintegration efforts. Nonetheless, she maintained relationships with multiple sex offenders during the case and was still married to and living with one at the time of the termination hearing. See *In re C.B.*, 2015 WL 2137313, at *9 (finding reasonable agency efforts failed where "Mother consistently chose the romantic relationship" over reintegration).

Additionally, though the parties do not discuss the stable income reintegration task, the evidence showed Mother did not work and relied on her grandparents—who were 89 and 87 years old at the time—for income. And while Mother had consistently attended visits, those visits never progressed to unsupervised visits because of T.S.'s presence in the home. Under these facts, there was clear and convincing evidence that Mother was unfit under K.S.A. 38-2269(b)(7).

In sum, we recognize that Mother was participating in the Darkness to Light class until COC eliminated its parent-partner position. However, Mother never completed the class, despite being given alternative resources prior to the parent partner's departure. Furthermore, it is not clear what more COC should have done to help Mother understand that her relationships with sex offenders posed significant bars to the reintegration process. Even if there may have been some additional resources or services that could have helped Mother, this court has stated that agencies are not required to provide every theoretical resource to facilitate reintegration. They are only required to make "'reasonable efforts.'" *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019).

3. *K.S.A. 38-2269(b)(8)—Lack of effort to adjust the parent's circumstances, conduct, or condition*

Mother argues there was not clear and convincing evidence that she failed to adjust her circumstances. Mother claims Wieberg testified that she showed growth in understanding sex offenders and protecting B.F. She reiterates that she completed most of her reintegration tasks and suggests COC improperly restricted reintegration without analyzing whether T.S. was a safety risk for B.F. Mother attempts to mitigate T.S.'s sex offender status by noting that his sex offense did not involve children.

The State responds that Wieberg testified to Mother's growth in the way she treated B.F. during visits, but Wieberg did not believe Mother had grown in understanding the dangers of having sex offenders in the home. The State submits that Mother's lack of progress beyond supervised visits and her inability to protect B.F. showed that she failed to adjust her circumstances or conduct.

Again, as discussed in the preceding section, neither Wieberg nor anyone else at COC was operating on unilateral authority in stalling reintegration based on T.S.'s presence in the home. The prohibition on associating with known sex offenders was one of Mother's court-approved reintegration tasks.

While Mother had completed several reintegration tasks, she had yet to complete the Darkness to Light class and, at the time of the termination hearing, was still married to and residing with a sex offender. These were important tasks given the reasons B.F. entered DCF custody in the first place. Agency workers had multiple discussions with Mother about associating with sex offenders during the case. Additionally, as the State points out, Mother mischaracterizes Wieberg's testimony on the areas where Mother showed growth. Wieberg testified that Mother had grown in her interactions with B.F. during visits. But Wieberg had seen no growth in Mother's understanding of child

16

endangerment and associating with sex offenders. When Wieberg informed Mother of the termination proceedings, Mother responded, "'Well, then, I guess I will just see [B.F.] when he's 18.'"

At the CINC adjudication hearing for Mother's other child, T.J.S.—less than two months before the termination hearing in this case—DCF child protection specialist Cara Weaver testified that Mother "did not seem to have any understanding of why [B.F.] was in DCF custody." Weaver also testified that Mother admitted B.F. "had been sexually abused by a previous relationship, but couldn't identify her role in the removal" from the home. This lack of understanding of safety risks to B.F. and Mother's unwillingness to stop associating with sex offenders were key factors in stymying progression to unsupervised visitation.

We find that this evidence is clear and convincing that Mother failed to adjust her circumstances to meet B.F.'s needs under K.S.A. 38-2269(b)(8). See *In re S.C.*, 65 Kan. App. 2d 128, 158, 561 P.3d 538 (2024); *In re S.D.*, 41 Kan. App. 2d 780, 791, 204 P.3d 1182 (2009).

4. *K.S.A. 38-2269(c)(3)—Failure to carry out a reasonable plan directed toward reintegration*

Mother asserts the district court erroneously cited her failure to progress to unsupervised visits under this factor. She restates her contention that Wieberg blocked visitation progression and reintegration based on a nonexistent DCF policy regarding sex offenders residing in the home. Mother maintains it was "improper and prejudicial" to inhibit reintegration based on T.S.'s registry status when his underlying offense did not involve children and DCF had no apparent policy on the matter.

17

The State counters that the district court properly relied on Mother's failure to comply with the court-approved reintegration task barring association with sex offenders and Mother's failure to advance beyond supervised visits.

Once again, as the State notes, the prohibition on associating with sex offenders was a court-approved reintegration task. Wieberg did not conjure this requirement on her own accord without the district court's—or Mother's—input.

We understand that Mother completed many reintegration tasks. But her incomplete tasks loomed large in light of B.F.'s initial removal due to his exposure to sexual conduct and Mother's inability to understand B.F.'s safety needs by allowing sex offenders in the home. DCF decided to proceed with removal after Mother downplayed Father's sex offenses and said she would allow S.B.—who was on probation for an offense committed while supervising B.F.—back into the home. Mother then married T.S., another known sex offender, and continued that marriage despite being ordered not to associate with known sex offenders.

Mother highlights that the victim of T.S.'s underlying sex offense was an adult, not a child. But that ignores that the reintegration plan prohibited Mother from associating "with individuals who have a known history of sexual abuse *in any capacity*." (Emphasis added.) Furthermore, as the district court acknowledged, T.S. had other convictions for violating protection orders and a charge for harassment and emotional distress of a person under 17 years old. We thus conclude that there was clear and convincing evidence that Mother was unfit under K.S.A. 38-2269(c)(3).

B.    *Mother's Conduct Was Unlikely to Change in the Foreseeable Future*

After the district court finds a parent unfit, it must determine whether the parent's conduct or condition is unlikely to change in the foreseeable future from the child's

perspective of time. This is because children have different perceptions of time than adults and have a right to permanency within a reasonable time frame. When making this inquiry, courts "'may look to a parent's past conduct as an indicator of future behavior.'" *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024); see K.S.A. 38-2269(a).

Mother argues there was not clear and convincing evidence that her conditions of unfitness were unlikely to change. She notes that she completed most of her reintegration tasks, Wieberg failed to make up or extend visitation time when she should have, and there was evidence that she improved with reintegration throughout the case. Mother also asserts that while Dr. Hazel testified that people with lower cognitive functioning could parent with additional services, the State failed to provide those services. In Mother's view, this lack of additional services "should not then become self-fulfilling that she was unfit to parent." Finally, Mother suggests the district court failed to properly consider the circumstances of T.S.'s registry status before relying on Mother's relationship with him in finding that her unfitness was unlikely to change.

The State responds that B.F. was in DCF custody for 30 months. During that time, Mother had opportunities and resources to reintegrate but failed to complete the tasks involving protecting B.F. Additionally, the State submits that Mother's comment to Wieberg—upon learning of the termination proceedings—that she would see B.F. when he turned 18, showed that she chose her relationship with T.S. over B.F.

As to Mother's claim of an alleged lack of additional services, Mother was not at fault for COC eliminating its parent-partner position. But Mother did receive alternative service recommendations before the parent partner's departure. Furthermore, COC made numerous efforts to help Mother understand that her relationships with sex offenders would hinder reintegration. Agencies are only required to make "'reasonable efforts.'" *In re M.S.*, 56 Kan. App. 2d at 1257. COC did just that in this case.

19

Mother's contention that the district court failed to analyze the circumstances of T.S.'s sex offender status is equally unpersuasive. The district court was aware of the nature of T.S.'s prior offenses. In finding Mother unfit, the district court noted T.S.'s rape conviction, as well as his other convictions "regarding aggression, regarding lack of boundaries, [and] regarding inappropriate behavior." The district court acknowledged there was no evidence that T.S. himself had harmed B.F., but there was evidence that Mother's prior partners had harmed B.F.

Furthermore, at the CINC adjudication hearing for T.J.S., Weaver testified that Mother's grandmother, J.B., was "hesitant to state her concerns" regarding Mother's and T.S.'s parenting. J.B. told Weaver she feared T.S. "would be forceful with [T.J.S.]. . . . And [B.F.] if [B.F.] came back." J.B. testified that she was concerned with T.S.'s verbal aggressiveness toward Mother when they first moved into J.B.'s home. Although J.B. claimed T.S. was a changed man and disputed Weaver's testimony that she feared T.S. would be forceful with the children, the district court found J.B. not credible on those points.

Moreover, Mother's argument here again ignores that the reintegration plan prohibited her from associating with individuals who committed sex offenses in any capacity, not just those who offended against children. Mother knew for over a year that her relationship with T.S. would be a roadblock to reintegration. At the time of the termination hearing, B.F. had been in DCF custody for over 16 months. After B.F.'s removal due to Mother's willingness to allow a sex offender back into the home, Mother began a relationship with another sex offender, despite warnings that the relationship would block reintegration. Mother made no progress in understanding the safety risks in exposing B.F. to sex offenders, nor did she show any willingness to put B.F.'s needs above her relationship with T.S. There is no evidence that Mother intends to comply with the reintegration task of not associating with known sex offenders. Therefore, there is

clear and convincing evidence that Mother's conduct is unlikely to change in the foreseeable future. See K.S.A. 38-2269(a).

### C.    *Termination Was in the Child's Best Interests*

Upon finding a parent unfit, the district court must "consider whether termination of parental rights . . . is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1).

A district court's determination of the child's best interests under K.S.A. 38-2269(g)(1) should be reviewed for abuse of discretion. The district court makes the best-interests determination based on a preponderance of the evidence. Appellate courts determine whether the district court's factual findings are supported by substantial evidence. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). The Kansas Supreme Court has not yet weighed in on the proper standard for the best interests finding. *In re D.G.*, 319 Kan. at 463 (declining to decide whether clear and convincing standard or preponderance standard applies to best interests finding).

Mother submits that the district court "failed to give appropriate attention to K.S.A. § 38-2269(a) as the court 'may' terminate parental rights but is not required to do so." She claims her completion of most reintegration tasks, her consistent visitation with B.F., and the testimony that she could parent with proper state services showed reintegration was in B.F.'s best interests.

The State responds that the district court was in the best position to determine B.F.'s best interests and its ruling should not be disturbed.

The record does not support Mother's assertion that the district court misinterpreted K.S.A. 38-2269(a). There is no indication that the district court believed it was required to terminate Mother's parental rights. The court's ruling shows it considered several factors in finding termination was in B.F.'s best interests, including B.F.'s young age when he entered DCF custody, the length of the case, Mother's poor judgment in the men she allowed around B.F., and B.F.'s stable out-of-home placement.

The record supports the district court's findings in this regard. As has been discussed in detail, Mother has maintained relationships with known sex offenders throughout this case and has shown no understanding of the safety risks these relationships pose to B.F. B.F. was three years old when he entered DCF custody. At the time, he had a speech delay, was not potty trained, and was generally "developmentally behind." Since entering DCF custody, B.F. had been "making great progress" in all respects. Accordingly, we find no abuse of discretion in the district court's finding that termination was in B.F.'s best interests. See *In re E.L.*, 61 Kan. App. 2d 311, 330, 502 P.3d 1049 (2021).

II.    *COC Did Not Violate Mother's Due Process Rights*

*Preservation*

Mother argues that COC violated her due process rights by relying on a purported DCF policy to bar reintegration based on T.S.'s sex offender status. She suggests she preserved this issue for appeal with her general objection at the termination hearing that the case progress "'plainly violates the [C]onstitution.'"

We disagree with Mother's claim that she preserved this issue with her objection at the termination hearing. In context, Mother's objection at the termination hearing appears to have been targeted at B.F.'s initial removal from the home. Mother's counsel claimed

22

that B.F.'s removal based on "concern" rather than "something substantial happening" violated the United States Constitution. Counsel took issue with Mother's no-contest statement at the adjudication hearing, which she entered on advice of different counsel. Mother did not argue that DCF violated her due process rights by preventing reintegration.

Appellate courts typically do not consider constitutional claims for the first time on appeal. However, courts have discretion to consider a new argument on appeal where (1) the issue is a question of law on undisputed facts; (2) consideration is necessary to serve the ends of justice or prevent the denial of fundamental rights; or (3) the district court was right for the wrong reason. *In re A.S.*, 319 Kan. 396, 399, 555 P.3d 732 (2024).

Mother alternatively asks us to consider this issue for the first time on appeal to protect her fundamental liberty interest in the care, custody, and control of her child. The State does not address preservation. Other panels of this court have reviewed unpreserved constitutional claims in parental termination proceedings under the fundamental rights exception, and we will do the same here. See, e.g., *In re S.C.*, 65 Kan. App. 2d at 144.

*Standard of Review*

"Appellate courts apply an unlimited standard of review in assessing whether an individual's due process rights were violated under specific circumstances, which poses a question of law." *In re A.S.*, 319 Kan. at 399.

23

*Discussion*

A.      *Mother's Substantive Due Process Rights Were Not Violated*

Substantive due process "protects individuals from arbitrary state action." *Creecy v. Kansas Dept. of Revenue*, 310 Kan. 454, 462, 447 P.3d 959 (2019). In particular, due process protects individuals from "government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). Determining whether a state action is arbitrary depends "on whether it is legislation or a specific act of a governmental officer that is at issue." *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). A government official's conduct can be arbitrary if it is so egregious that it "shocks the conscience." 523 U.S. at 846.

The parties do not benefit us with a particularly detailed analysis on this point. Mother seems to claim Wieberg acted arbitrarily in inhibiting reintegration and unsupervised visitation based on an alleged DCF policy against reintegration with a sex offender in the home, even though no such policy exists. Mother suggests that Wieberg exercised "ultimate authority to stall and absolutely prevent reintegration based [on] a DCF policy" that Wieberg herself could not identify. She asserts "the existence of the policy cuts to the heart of the case," given that Wieberg testified that reintegration was possible if Mother was not married to T.S.

The State simply responds that "[t]he issue in this case is not whether or not a policy exists that precludes a sex offender in the home, it is whether or not [Mother] has the ability to provide oversight to a registered sex offender in the home."

As a starting point, Mother has a protected fundamental liberty interest in the care, custody, and control of her child. See *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021).

24

But again, we must point out that Mother mischaracterizes the nature of Wieberg's actions in this case. Wieberg did not exercise "ultimate authority to stall and absolutely prevent reintegration" based solely on DCF policy. Wieberg was acting under a court-approved reintegration plan that prohibited Mother from associating with sex offenders. Whether or not DCF has a specific policy on the matter, this was a court-ordered task based on Mother's history of being with sex offenders and her failure to protect B.F. We are hard-pressed to find that Wieberg engaged in arbitrary conduct simply by carrying out the reintegration plan. And as previously noted, Mother does not challenge the reasonableness of the reintegration plan itself. We find Mother's substantive due process rights were not violated.

        B.       *Mother's Procedural Due Process Rights Were Not Violated*

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the care, custody, and control of the child, the parent is entitled to due process of law. But this "fundamental right to parent is not without limits." *In re P.R.*, 312 Kan. at 778. Because child welfare is a matter of state concern, the State may assert its interest "through state processes designed to protect children in need of care." *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019).

"'The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'" *In re A.S.*, 319 Kan. at 402. Our Supreme Court has adopted the three-factor test outlined in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), to determine whether a parent's due process rights were violated. Those three factors are:

25

"'(1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the State's interest in the procedures used, including the fiscal and administrative burdens that any additional or substitute procedures would entail.'" *In re A.A.-F.*, 310 Kan. at 145.

Mother also submits that Wieberg's reliance on DCF policy was a procedural due process violation. She argues she had a fundamental liberty interest in parenting B.F., there was a risk of erroneous deprivation of her rights based on a nonexistent DCF policy, and the State had a "minimal" administrative burden of providing the DCF policy and procedure manual. Mother suggests that producing the DCF manual "would have put Mother on notice of the policy and prevented unfair surprise at trial that there was an actual policy and support for [Wieberg's] actions in preventing reintegration."

The State responds that Mother was present with counsel at the June 2022 CINC adjudication hearing when the district court adopted—over Mother's objection—the reintegration plan prohibiting Mother from associating with sex offenders. Therefore, the State maintains that T.S. being a bar to reintegration was not a surprise to Mother at the termination hearing. The State contends that Mother signed the reintegration plan, had notice that her relationship with T.S. would hinder reintegration, and had an opportunity to challenge the reintegration plan on those grounds. Therefore, the State submits that Mother fails to satisfy the second and third steps of the *Mathews* test.

Starting with the first *Mathews* factor—the individual interest at stake—the parties do not dispute that Mother has a protected liberty interest in the care, custody, and control of B.F. See *In re P.R.*, 312 Kan. at 778.

The second factor—the risk of erroneous deprivation—however, is lacking here. Again, Wieberg did not solely rely on DCF policy in this case. The parties in this case were operating under a court-approved reintegration plan. Mother claims she was unfairly

26

surprised by the apparent lack of a specific DCF policy on reintegration with a sex offender in the home. But she does not challenge the fact that she was told from the outset that her relationships with sex offenders would hinder reintegration, she signed the proposed reintegration plan, and she had an opportunity to challenge the reintegration plan at the adjudication hearing. See *In re S.C.*, 65 Kan. App. 2d at 146 (finding second *Mathews* factor not present where Father did not allege lack of opportunity to be heard).

Regarding the third factor—the State's interest in the procedures used—though Mother claims the State would have had a minimal burden of producing the DCF policy manual to prevent unfair surprise, the DCF manual was not the operative document in this case. Rather, it was the court-approved reintegration plan. Before the adjudication hearing, Wieberg presented a copy of the proposed reintegration plan to Mother, which Mother signed. Mother then appeared with counsel at the adjudication hearing and requested that the prohibition on associating with sex offenders be reworked in light of her marriage to T.S. The district court denied that request. Thus, Mother was not unfairly surprised at the termination hearing. She knew for over a year that, to achieve reintegration, she could not associate with known sex offenders. Accordingly, Mother fails to show a procedural due process violation. See *In re R.M.*, No. 115,945, 2017 WL 2021925, at *8 (Kan. App. 2017) (unpublished opinion) (rejecting due process claim where Mother knew reintegration plan required ending relationship with child's abuser but Mother failed to do so).

In conclusion, the district court's determinations that Mother was unfit and that Mother's conduct was unlikely to change in the foreseeable future were supported by clear and convincing evidence. The district court did not abuse its discretion in finding termination was in B.F.'s best interests. And Mother's due process rights were not violated.

Affirmed.